# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **KATHLEEN NORGAARD,** | ) | Civil Action No. |
|  | ) | 16-12107-FDS |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| **UNITED STATES of AMERICA,** | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## MEMORANDUM AND ORDER ON
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action for a tax refund and related claimed damages. Plaintiff Kathleen Norgaard is proceeding *pro se*.

In 2008, Kathleen Norgaard and her husband James Norgaard opened a small marine supply store called Lynn Marine Supply, Inc. In 2010, the company secured a Small Business Administration loan in the principal amount of $85,000. The business was not successful and was unable to make payments on the loan. To repay the company's debts, Kathleen obtained a reverse mortgage on her residence. That was insufficient to save the company, which closed in early 2012.

Kathleen now contends that she is entitled to a "bad debt" deduction pursuant to § 166 of the Internal Revenue Code and a refund of approximately $140,000. She also seeks money damages and injunctive relief against the United States.

The government has moved for summary judgment in its favor. For the following

reasons, the motion will be granted.

I. **Background**

The following facts are as set forth in the government's statement of material facts and accompanying exhibits. Because plaintiff has not opposed the government's statement of material facts, the Court deems those facts admitted. *See Stonkus v. City of Brockton Sch. Dep't*, 322 F.3d 97, 102 (1st Cir. 2003).

A. **Factual Background**

1. **Acquisition and Financing of Lynn Marine Supply**

Kathleen and James Norgaard are married. On April 1, 2008, the Norgaards purchased Lynn Marine Supply, Inc. for $10,000. (Compl. ¶ 18; Def. Ex. A ¶ 4(a)). Lynn Marine was a corporation. Kathleen owned 51 percent of the company, and James owned the remaining 49 percent. (Def. Ex. B ¶ 12). The Norgaards were the only officers and directors of Lynn Marine. (*Id.* ¶ 13).

On October 1, 2009, to increase the company's business, the Norgaards began seeking federal and state government-supply contracts. (Compl. ¶ 22). To obtain those contracts, they decided additional financing was necessary. (*Id.*). They applied for a small-business loan for the company through Eastern Bank. (Def. Ex. D). That loan application was denied on March 4, 2010, for (1) insufficient collateral, (2) projected inability to repay principal, (3) delinquent credit history, and (4) lack of established earnings. (*Id.*).

The Norgaards then applied for a Small Business Administration ("SBA") loan through Marblehead Bank. (Compl. ¶ 22; Def. Ex. E). A loan to Lynn Marine, with a principal amount of $85,000, was approved on April 30, 2010. (Def. Ex. E at 1). The note stated that "[a]ll individuals and entities signing this Note are jointly and severally liable." (*Id.* at 6, § 9(a)). In

2

addition, the note stated that "[b]y signing below, each individual or entity becomes obligated under this Note as Borrower." (*Id.* at 8, § 11). Both Kathleen (as secretary of Lynn Marine) and James (as president of Lynn Marine) signed the note on behalf of Lynn Marine. (*Id.* at 8).

At the same time, Kathleen executed a document guaranteeing the SBA loan. (Compl. ¶ 23; Def. Ex. F). The document, titled "UNCONDITIONAL GUARANTEE," stated that she promised "to pay all expenses Lender [Marblehead Bank] incurs to enforce this Guarantee, including, but not limited to, attorney's fees and costs." (Def. Ex. F at 3, § 9(a)). As security for the guarantee, Kathleen granted Marblehead Bank a mortgage on her residence in Marblehead. (Compl. ¶¶ 25-26; Def. Ex. G at 1).

The complaint alleges that Lynn Marine was then able to win several small government-supply contracts. (Compl. ¶ 29). However, according to the complaint, the SBA loan payments "compromise[d] necessary purchasing requirements for the store business," and the business struggled. (*Id.* ¶ 31).

### 2. **Kathleen Obtains a Reverse Mortgage**

In early 2011, because Lynn Marine was facing financial difficulty, Kathleen decided to repay the SBA loan in full. To do so, she obtained a reverse mortgage on her Marblehead residence through Wells Fargo Bank. (Def. Ex. H at 1). The principal amount of the reverse mortgage was $382,200. (*Id.*; Compl. ¶ 32). The $382,200 loan was allocated as follows: $84,164.06 went to repay the SBA loan; $280,350.31 went to repay another loan from National Grand Bank; $12,608.00 went to origination fees; $493.91 went to Kathleen herself; and the remainder went to other closing fees. (Def. Ex. H at 1-2). The SBA loan was repaid in full on March 31, 2011. (Def. Ex. E at 1).

Other than the Norgaards, no person invested money in Lynn Marine. (Def. Ex. A ¶ 4(a)-

3

(b); Ex. B ¶ 7; Ex. C ¶ 7).

### 3. Lynn Marine's Closure

In November 2011, Kathleen suffered a severe illness and stopped working. (Compl. ¶ 34). The following month, December 2011, James filed for personal bankruptcy. (*Id.* ¶ 35). James's bankruptcy filings indicated that neither he nor Kathleen had any income in January 2012 other than Social Security or other retirement benefits. *See In re James Norgaard*, No. 11-21628, Docket No. 15, at 14 (Bankr. D. Mass. Jan. 6, 2012). Lynn Marine closed at the end of first quarter 2012. (Compl. ¶ 36).

There was no written agreement between Kathleen and Lynn Marine for the company to reimburse her for the amount she personally paid toward the SBA loan. (Def. Ex. B ¶ 1; Ex. C ¶ 1). Lynn Marine never made any such reimbursement payments, or offered any collateral in connection with the loan. (Def. Ex. B ¶¶ 2, 4-5; Ex. C ¶¶ 2, 4-5). Kathleen did not require Lynn Marine to create a "sinking fund" as a condition for her guaranteeing and later repaying the SBA loan. (Def. Ex. B ¶ 11; Ex. C ¶ 11).[1] The only way Lynn Marine could have reimbursed Kathleen was to pay her out of its future earnings. (Def. Ex. B ¶ 8; Ex. C ¶ 8).

### 4. Kathleen's Tax History from 2001 to 2012

#### a. Tax Year 2001

Kathleen filed her 2001 tax return on November 5, 2003. (Def. Ex. I at 2). The only payments she made for her 2001 tax liabilities was through withholding in the amount of $31,123. (*Id.*). She was credited for that amount on April 15, 2002. (*Id.*). Later, the IRS applied five overpayment credits to her remaining 2001 tax liabilities between 2007 and 2009.

---

[1] A sinking fund is "[a] fund consisting of regular deposits that are accumulated with interest to pay off a long-term corporate or public debt." *In re Lyondell Chemical Co.*, 544 B.R. 75, 101 (Bankr. S.D.N.Y. 2016) (quoting Black's Law Dictionary (10th ed. 2014)).

(*Id.* at 3-5). With the credits, Kathleen has no outstanding balance on her 2001 tax liabilities, and she has not sought a refund for that tax year. (*See generally* Def. Ex. I).

### b. Tax Year 2002

Kathleen filed her 2002 tax return on November 12, 2003. (Def. Ex. J at 2). She did not make any withholding payments for 2002, although she did include a payment when she filed the return. (*Id.*). The IRS applied one overpayment credit to her 2002 tax liabilities on April 15, 2002, because of an overpayment for 2001. (*Id.*). The IRS eventually wrote off her remaining tax liability of $0.28 on December 22, 2003. (*Id.*). She has not sought a refund for that tax year. (*See generally* Def. Ex. J).

### c. Tax Year 2003

Kathleen filed her 2003 tax return on November 2, 2005. (Def. Ex. K at 2). She only made payments for her 2003 tax liabilities through withholding in the amount of $11,970. (*Id.*). She was credited for that amount on April 15, 2004. (*Id.*). Later, the IRS refunded $5,916.89 from her withholding. (*Id.*). She has no outstanding balance on her 2003 tax liabilities, and she has not sought a refund for that tax year. (*See generally* Def. Ex. K).

### d. Tax Year 2004

Kathleen did not initially file a 2004 tax return. (Def. Ex. L at 2). The IRS conducted an examination to assess her tax liability. (*Id.*). She filed an amended 2004 tax return on April 8, 2009. (*Id.* at 4). There were two separate payments made on her 2004 tax liabilities: $2,051 in withholding credited on April 15, 2005, and $24,731.25 on December 28, 2009. (*Id.* at 2, 5). In 2009, the IRS applied an overpayment credit of $623.85 stemming from her 2008 tax return. (*Id.* at 5). In addition, the IRS provided two refunds. (*Id.* at 2, 6). She has no outstanding balance on her 2004 tax liabilities, and she has not sought a refund for that tax year. (*See generally* Def.

Ex. L).

### e. Tax Year 2005

Kathleen filed her 2005 tax return on September 16, 2008. (Def. Ex. M at 2). She made a direct payment in the amount of $4,723.01 for her 2005 tax liabilities on December 28, 2009. (*Id.* at 3-4). Later, the IRS refunded $23.76. (*Id.* at 4). She has no outstanding balance on her 2005 tax liabilities, and she has not sought a refund for that tax year. (*See generally* Def. Ex. M).

### f. Tax Year 2006

Kathleen filed her 2006 tax return on September 16, 2008. (Def. Ex. N at 2). She filed an amended 2006 tax return on April 8, 2009. (*Id.*). She did not owe any taxes for the 2006 tax year, (*id.* at 2-3), and accordingly the IRS applied a $30 overpayment credit from that tax year to her 2001 tax liabilities (*id.* at 2). However, she produced a Form 1040 for 2006 dated December 15, 2014, with the words "Revised Carryback" handwritten at the top. (Def. Ex. U). In that form, she appears to seek a refund of $30 for "federal telephone excise tax paid." (*Id.* at 2).

### g. Tax Year 2007

Kathleen filed her 2007 tax return on April 15, 2008. (Def. Ex. O at 2). She only made payments for her 2007 tax liabilities through withholding in the amount of $26,966. (*Id.*). She was credited for that amount on April 15, 2008. (*Id.*). The IRS allocated $8,044 of that amount toward her 2007 tax liabilities and credited the remaining $18,922 to her 2001 tax liabilities. (*Id.*). Later, she also claimed a refundable credit of $1,200, which the IRS granted on June 2, 2008. (*Id.*). That amount was also credited toward her 2001 tax liabilities. (*Id.*). She has no outstanding balance on her 2007 tax liabilities. (*See generally* Def. Ex. O).

However, on June 24, 2015, Kathleen filed an amended 2007 tax return. (*Id.* at 2). According to the Form 1040X, she sought a refund of $28,166. (Def. Ex. V at 1). The

6

government calculates that the $28,166 equals the sum of her withholding for 2007 that was credited to her 2007 tax liabilities ($8,044), her withholding for 2007 that was credited to her 2001 tax liabilities ($18,922), and a refundable credit that was credited to her 2001 tax liabilities ($1,200). (Def. SMF ¶ 78).

### h. Tax Year 2008

Kathleen filed her 2008 tax return on April 15, 2009. (Def. Ex. P at 2). She only made payments for her 2008 tax liabilities through withholding in the amount of $11,090. (*Id.*). She was credited for that amount on April 15, 2009. (*Id.*). The IRS allocated $6,979.15 of that amount toward her 2001 tax liabilities and $623.85 toward her 2004 tax liabilities. (*Id.*). She received a refund of $421, and the remainder went toward her 2008 tax liabilities. (*Id.*). She has no outstanding balance on her 2008 tax liabilities. (*See generally* Def. Ex. P).

On June 24, 2015, the IRS received an amended 2008 tax return. (*Id.* at 2). According to the Form 1040X, Kathleen sought a refund of $38,815. (Def. Ex. W at 1). She attributed $11,970 of that amount to excess tax withholdings, and the remaining $27,725 to "refundable credits" that were "TAKINGS BY IRS." (*Id.*).[2] The government calculates that the $27,725 equals the sum of her withholding for 2008 that was credited to her 2001 tax liabilities ($6,979.15), her withholding for 2008 that was credited to her 2004 tax liabilities ($623.85), her withholding for 2007 that was credited to her 2001 tax liabilities ($18,922), and a refundable credit that was that was credited to her 2001 tax liabilities ($1,200). (Def. SMF ¶ 88).

### i. Tax Year 2009

Kathleen filed her 2009 tax return on June 20, 2011. (Def. Ex. Q at 2). She did not make any withholding payments, though she did make a direct payment of $295.18 on September 6,

---

[2] It appears that plaintiff miscalculated her requested total refund amount. The sum of $11,970 and $27,725 is $39,695, which is $880 more than the refund sought.

7

2011. (*Id.*). She has no outstanding balance on her 2009 tax liabilities. (*See generally* Def. Ex. Q).

On June 24, 2015, the IRS received an amended 2009 tax return. (*Id.* at 2). According to the Form 1040X, Kathleen sought a refund of $29,454. (Def. Ex. X at 1). The government calculates that the $29,454 equals the sum of her December 2009 payments that were credited to her amended 2004 tax return ($24,731) and amended 2005 tax return ($4,723). (Def. SMF ¶ 95).

### j. Tax Year 2010

Kathleen filed her 2010 tax return on August 11, 2011. (Def. Ex. R at 2). She did not owe any taxes for 2010. (*Id.*). The IRS refunded her $342.36 because she claimed a refundable credit. (*Id.*). She has not sought a refund for that tax year. (*See generally* Def. Ex. R).

### k. Tax Year 2011

Kathleen has not filed a 2011 tax return, and the IRS has not assessed her tax liability for that year. (Def. Ex. S at 2). She has made no payments for tax year 2011, and has not sought a refund for that tax year. (*See generally* Def. Ex. S).

### l. Tax Year 2012

Kathleen filed her 2012 tax return on August 7, 2013. (Def. Ex. T at 2). She did not owe any taxes for 2012. (*Id.*).

On January 2, 2015, the IRS received an amended 2012 tax return. (*Id.*). According to the Form 1040X, Kathleen did not request a refund for the 2012 tax year. (Def. Ex. Y at 1). Instead, the Form 1040X decreased her adjusted gross income by $2,200, and increased the amount of her loss from a bad debt from $85,000 to $107,118. (*Id.*, Line 7).

### B. Procedural Background

Plaintiff filed a *pro se* complaint on October 24, 2016, alleging seven counts against the

United States.[3]  Counts 1, 3, and 4 allege that the IRS improperly categorized her guarantee for the SBA loan as a non-business debt in violation of § 166 of the Internal Revenue Code.  Counts 2 and 8 allege that the IRS improperly declined to carryback her bad debts for seven years in violation of § 6511 of the Internal Revenue Code.  Counts 5 and 7 allege that the IRS erred by stating her bad debt should have been claimed in 2011 rather than 2012.[4]  The complaint seeks a tax refund, and appears to seek damages and various forms of injunctive and declaratory relief.

The government moved for summary judgment on all counts on November 9, 2017.  During a hearing on January 9, 2018, the Court noted that plaintiff had not filed an opposition or statement of material facts in response to the government's motion for summary judgment.  The Court then granted her until January 16, 2018, to file additional briefing.  However, plaintiff has not filed any opposition as of this date.

## II.     Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational fact finder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896

---

[3] The complaint asserts nine causes of action.  However, Counts 6 and 9 merely acknowledge mistakes plaintiff made in various calculations.

[4] The government concedes that Lynn Marine closed in 2012, and thus had there been a bona fide debt the company owed to plaintiff, it would have become worthless in that year rather than 2011.  Accordingly, counts 5 and 7 appear to be moot.

F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

### III. Motion for Summary Judgment

For the reasons set forth below, plaintiff's claims are barred in their entirety because (1) plaintiff's refund claims are time-barred; (2) the Court may not award damages, as the United States has not waived sovereign immunity under the circumstances presented here; and (3) the claims for injunctive and declaratory relief are barred by the Anti-Injunction Act, 26 U.S.C. § 7421(a), and the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

#### A. The Refund Claim is Time-Barred

There are two requirements a taxpayer must satisfy before bringing a tax refund suit against the government. Section 1346(a)(1) first requires "full payment of the assessment before an income tax refund suit can be maintained in a Federal District Court." *Flora v. United States*, 362 U.S. 145, 177 (1960) (citing 28 U.S.C. § 1346). The parties agree that plaintiff has made full payment of her tax liabilities. Next, section 7422(a) of the Internal Revenue Code requires that the taxpayer timely file an administrative claim with the IRS within the time limit set forth in section 6511(a). *See Dickow v. United States*, 654 F.3d 144, 149 (1st Cir. 2011) (citing 26 U.S.C. § 7422(a)). Section 6511(a) requires that such claims be made within three years from when the return was filed or two years from when the tax was paid, whichever is later.

Plaintiff is seeking a refund for the 2006-09 tax years, which in turn included payments credited to her 2001, 2004, and 2005 tax year liabilities. As shown below, she was untimely in filing a refund claim for each of those years:

- Plaintiff's 2001 tax return was filed on November 5, 2003. (Def. Ex. I at 2). The last payment toward her 2001 tax liabilities was made on April 15, 2009. (Def. Ex. P at 2). Accordingly she would have had to have filed a refund claim by April 15, 2011.

- Plaintiff's 2004 tax return was filed on April 8, 2009. (Def. Ex. L at 4). The last payment toward her 2004 tax liabilities was made on December 28, 2009. (*Id.* at 5). Accordingly, she would have had to have filed a refund claim by April 8, 2012.

- Plaintiff's 2005 tax return was filed on September 16, 2008. (Def. Ex. M at 2). The last payment toward her 2005 tax liabilities was made on December 28, 2009. (*Id.* at 3-4). Accordingly, she would have had to have filed a refund claim by December 28, 2011.

- Plaintiff's 2007 tax return was filed on April 15, 2008. (Def. Ex. O at 2). The last payment toward her 2007 tax liabilities was made that same day. (*Id.*). Accordingly, she would have had to have filed a refund claim by April 15, 2011.

- Plaintiff's 2008 tax return was filed on April 15, 2009. (Def. Ex. P at 2). The last payment toward her 2008 tax liabilities was made that same day. (*Id.*). Accordingly, she would have had to have filed a refund claim by April 15, 2012.

- Plaintiff's 2009 tax return was filed on June 20, 2011. (Def. Ex. W at 2). The last payment toward her 2009 tax liabilities was made on September 6, 2011. (*Id.*). Accordingly, she would have had to have filed a refund claim by June 20, 2014.

At the earliest, plaintiff did not submit the refund claim in this case to the IRS until December 15, 2014, which is after the deadline for each of the relevant tax years. (*See generally*

Def. Exs. U, V, W, X).[5] Therefore, she has not complied with the requirement of section 6511(a), and her refund claim is barred.

## B. Plaintiff Is Not Entitled to a Bad Debt Deduction

Even if the claim was timely, plaintiff's claim would fail on the merits, as she is not entitled to a bad-debt deduction.

Section 166 of the Internal Revenue Code allows taxpayers to take a deduction for debts that become worthless in a given tax year. *See* 26 U.S.C. § 166(a), (d). Section 166 applies only to "a bona fide debt." *See* 26 C.F.R. § 1.166-1(c). "A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." *Id.* A bona fide debt does not include either "[a] gift or contribution to capital." *Id.*

Section 166 does not apply to payments that discharge a guarantee when the payment constitutes a shareholder's contribution to capital.

> **(c) Obligations issued by corporations.** No treatment as a worthless debt is allowed with respect to a payment made by the taxpayer in discharge of part or all of the taxpayer's obligation as a guarantor, endorser, or indemnitor of an obligation issued by a corporation if, on the basis of the facts and circumstances at the time the obligation was entered into, the payment constitutes a contribution to capital by a shareholder. The rule of this paragraph (c) applies to payments whenever made (see paragraph (f) of this section).

26 C.F.R. § 1.166-9(c); *see Casco Bank & Trust Co. v. United States*, 544 F.2d 528, 535 (1st Cir. 1976).

Here, plaintiff's payment discharged her obligation as a guarantor (and a borrower) of the SBA loan. She was the majority shareholder of a small corporation. There was no written evidence of indebtedness (such as a note), no collateral or other security, and no fixed repayment

---

[5] December 15, 2014, is the date on which plaintiff purports to have filed her amended 2006-09 tax returns.

plan. Repayment, if it were to occur at all, was from the company's future earnings. In short, the objective economic reality is that the repayment of the loan was in fact a form of capital contribution. Section 166 does not apply, and plaintiff accordingly cannot claim a bad debt deduction.

### C. The Government Has Not Waived Sovereign Immunity

In addition to a tax refund, plaintiff appears to also seek damages and various forms of injunctive and declaratory relief. "Under settled principles of sovereign immunity, 'the United States, as sovereign, is immune from suit, save as it consents to be sued and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *United States v. Dalm*, 494 U.S. 596, 608 (1990) (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)) (internal quotations and alterations omitted); *see also* Charles A. Wright & Arthur R. Miller, 14 Fed. Prac. & Proc. § 3654 (4th ed.) ("[T]he absence of consent by the United States to suit has been treated by courts as a fundamental defect that deprives the district court of subject matter jurisdiction."). To the extent that the IRS is a defendant in this action, because it is an as an agency of the United States, it is also entitled to sovereign immunity. *Sarit v. U.S. Drug Enforcement Admin.*, 987 F.2d 10, 16 (1st Cir. 1993).

#### 1. The Damages Claim Is Barred

The complaint states that plaintiff requests "any other costs and interest due to inordinate delay of 13 months" that would place her "in the position that she should have been." (Compl. ¶ 74). The Court will construe this as a request for damages.

In 1988, Congress enacted a provision in the Internal Revenue Code as part of the Taxpayer Bill of Rights to create a right of action for taxpayers to seek damages "sustained due to unreasonable actions taken by an IRS employee." *Gonsalves v. I.R.S.*, 975 F.2d 13, 15 (1st

13

Cir. 1992) (quoting Conf. Rep. No. 1104, 100th Cong., 2d Sess., at 228). That provision was codified as 26 U.S.C. § 7433.

However, section 7433 specifies that the United States will not waive sovereign immunity unless an IRS agent or employee has "disregard[ed] any provision of this title, or any regulation promulgated under this title." 26 U.S.C. § 7433(a). That section further states that "[a] judgment for damages shall not be awarded . . . unless the court determines that the plaintiff has exhausted the administrative remedies available to such plaintiff within the Internal Revenue Service." 26 U.S.C. § 7433(d)(1). Even assuming the IRS violated an applicable statute or regulation in denying plaintiff's refund claim, plaintiff did not present a claim for damages to the agency. Therefore, sovereign immunity has not been waived and plaintiff's claim for damages must fail.[6]

### 2. **The Claim for Injunctive Relief Is Barred**

Finally, the complaint requests that a "corrected transcript and report . . . be placed in [plaintiff's] Federal and State income tax records" and that "[a]n order of Declaratory and Injunctive relief from any acts of discrimination or retaliation by [the government] regarding this matter" be entered. (Compl. ¶¶ 73, 75).

This Court is without jurisdiction to grant the injunctive relief sought. The Anti-Injunction Act, as codified in relevant part in the Internal Revenue Code, provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person." 26 U.S.C. § 7421(a). As the Supreme Court has stated, that statute bars state and federal courts from having jurisdiction to issue injunctions concerning the collection of federal taxes. *See Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 5 (1962). *See also*

---

[6] The United States may waive sovereign immunity for taxpayer suits seeking damages in limited circumstances, but none are applicable to this situation. *See* 26 U.S.C. §§ 7431(a), 7432(a), 7433(a), 7435.

14

*Bob Jones University v. Simon*, 416 U.S. 725, 736 (1974) ("The Court has interpreted the principal purpose of this language to be the protection of the Government's need to assess and collect taxes as expeditiously as possible with a minimum of pre-enforcement judicial interference, and to require that the legal right to the disputed sums be determined in a suit for refund.") (internal quotation marks and citations omitted); *Morris v. United States*, 540 Fed. Appx. 477, 481-82 (6th Cir. 2013) ("[C]ourts of appeals have interpreted the Tax Anti-Injunction Act as applicable not only to the assessment or collection itself, but to activities which are intended to or may culminate in the assessment or collection of taxes.") (internal quotation marks omitted) (collecting cases). Because plaintiff seeks to curtail the ability of the IRS to collect taxes, either by requiring that it permit her to carry forward the alleged bona fide debt or by preventing the imposition of any potential penalties, her claim for injunctive relief is barred by section 7421.[7] The only proper avenue for a taxpayer to pursue such a remedy is through a refund claim after the IRS has completed its assessment and collection process.

### 3. The Claim for Declaratory Relief Is Barred

Finally, the Declaratory Judgment Act independently bars this Court from granting plaintiff relief. Although the Act provides that "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking [a] declaration" in "a case of actual controversy within its jurisdiction," there is a carve-out for matters "with respect to Federal taxes." 28 U.S.C. § 2201(a).[8] The Act affirms the "congressional antipathy for premature interference with the assessment or collection of any federal tax . . . set out in the

---

[7] The request for a "corrected transcript and report" appears to reiterate plaintiff's claim that the IRS should have recognized a carryback for her purported bona fide debt or advance an argument that she should be allowed to carry forward that loss.

[8] There are limited exceptions enumerated in § 2201(a), but none are applicable here.

15

Anti-Injunction Act." *Bob Jones University*, 416 U.S. at 732 n.7. Accordingly, this Court lacks jurisdiction to grant plaintiff any declaratory relief in this matter.

## IV. Conclusion

For the foregoing reasons, defendant's motion for summary judgment is GRANTED.

**So Ordered.**

Dated: February 22, 2018

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge